Robert W. JOHNSON, John P. Williams, Nannie S. Williams, Elaine B. Hansen, Individually and in a representative capacity on behalf of all other persons similarly situated, Plaintiffs,

v.

NATIONWIDE INDUSTRIES, INC., Nationwide Condominium Corporation, Moss Financial Corporation, Outer Drive East Corporation, Randolph-Outer Drive Venture, Jupiter Industries, Inc., American Invsco Corporation, American Invsco Management, American Invsco Realty, Inc., American Invsco Insurance Services, Inc., Outer Drive East Garage, Inc., Harold Blankstein, Jerrold Wexler, Joseph Moss and NCC, Inc., Defendants.

No. 77 C 1162.

United States District Court, N. D. Illinois, E. D.

April 19, 1978.

Paul Gary, William D. Maddux, Jack T. Riley, Jr., Shelley B. Gardner, Jerald A. Kessler, Edgar J. Schoen, John P. Fox, Jr., Chicago, Ill., for plaintiffs.

Sheldon O. Collen, David W. Clark, John B. Simon, of Friedman & Koven, Wilbert F. Crowley, Jr., James F. Gebhart, of Coin, Edler & Crowley, Michael L. Shakman, Elaine E. Bucklo, of Devoe, Shadur & Krupp, Alvin Charles Katz, Jay Erens, Robert Berliner, Jr., of Levy & Erens, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

McGARR, District Judge.

Plaintiffs in this action (seeking to sue on behalf of a class of persons similarly situated as well as on their own behalf) are four owners of condominium units in a building in Chicago known as the Outer Drive East Condominium. For convenience and ease of understanding, we will in this opinion refer to the various defendants in groups. The first group, which we shall call the developer defendants, consists of two individuals and six corporations, some of which are entities resulting from various corporate reorganizations experienced by the other corporate defendants in the group. These defendants are alleged to have been collectively responsible for the original development of the property as an apartment building, and for its subsequent conversion in 1973 to condominiums. The second group of defendants, composed of one individual, Blankstein, and the corporation he is alleged to control, is involved with operating a garage on the property. The third group, which we shall call the Invsco defendants, consists of four corporations alleged to be the new owners of all the units previously held by the developer defendants

as unsold residential units and certain commercial units, and the new assignee of the building management contract.

The substance of the allegations in the Amended Complaint may be briefly summarized as follows: That the developers planned the condominium conversion in such a way that they were effectively able to maintain control over the designation of the firm that would be awarded the contract to manage the building, and were able to maintain control over the condominium "homeowners'" association us well; that the developers entered into an amendment of an existing lease of the garage facility that was more favorable to the lessee than to the condominium owners (who each own a proportionate share of the garage facility as a common element); that the terms of the garage lease and management contract were not disclosed prior to plaintiffs' purchases, nor was the Declaration of Condominium Ownership; that prior to their purchases plaintiffs were led to believe that operating expenses of the building would be offset by rents collected through the garage lease, while in fact the amendment to the garage lease effected a reduction in the amount of rent to be paid by the lessee in exchange for the lessee's promise to the developers of a certain number of parking spaces for the developers' use at reduced fees; that prior to their purchases plaintiffs were also led to believe that their purchases would be a good investment, while in fact there has been no remarkable appreciation in value, assessments have been higher than expected, and the persons realizing the greatest profit on their investments were the developer defendants, who sold their interests and assigned their rights to the management contract to some member or members of the Invsco group.

Plaintiffs marshall the foregoing allegations into four distinct legal theories, each of which is embodied in a separate count. Before the court are motions by each of the defendants to dismiss various portions of the amended complaint. Our analysis will proceed count by count, rather than motion by motion.

Count I alleges that plaintiffs were required, as a condition of purchase of their units, to "ratify and approve" both a long-term management contract and a long-term garage lease with parties of the developer defendants' choosing, the choice in each case being either a related corporation or one controlled by a close associate of the developer defendants. These imposed conditions are alleged to constitute illegal tying agreements in restraint of trade and in violation of § 1 of the Sherman Act (15 U.S.C. § 1).

The defendant developers move to dismiss, for failure to state a claim upon which relief may be granted, only that part of Count I dealing with the garage lease; defendants Blankstein and the corporate garage lessee move to dismiss or for summary judgment as to this part of the count for the same failure to state a claim, and move for dismissal of or for summary judgment on the rest of the count (dealing with the management contract) as well; the Invsco defendants move for dismissal or summary judgment as to the whole count. We will treat all motions simply as motions to dismiss.

The developer and garage lessee defendants contend that the facts alleged in Count I as to the garage lease fail to support a claim of an illegal tying agreement as that concept was defined in *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), and the cases following it, and they assert several reasons for that failure. We note only one, because we find it determinative.

An illegal tying agreement can be found when a seller of one product uses his market power over that product to force the sale of another product by making the purchase of one product a condition of the purchase of the other. Although in the more common form of tying agreement the tying seller is also the seller of the tied product, illegality has also been found when the two sellers are legally separate entities or individuals, but one seller has control over the other (as in the case of corporate subsidiaries) or the tying seller receives

some other economic benefit from the sale of the tied product. See *Fortner Enterprises, Inc. v. United States Steel,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Imperial Point Colonnades Condominium, Inc. v. Mangurian,* 549 F.2d 1029 (5th Cir. 1977); *Crawford Transport Co. v. Chrysler Corp.,* 338 F.2d 934 (6th Cir. 1964); *Ungar v. Dunkin' Donuts of America, Inc.,* 1975 Trade Cases, 68 F.R.D. 65 (E.D.Pa.1975). The agreement to tie need not be explicit, but may be inferred from the circumstances. See *Osborn v. Sinclair Refining Co.,* 286 F.2d 832 (4th Cir. 1960), *cert. denied,* 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255.

But one of the most obvious requirements for finding an illegal tying agreement is that there be in fact two products involved, so that one can properly be said to be tied to the other. See *Fortner Enterprises, Inc. v. United States Steel, supra; Washington Gas Light Co. v. Virginia Electric and Power Co.,* 438 F.2d 248 (4th Cir. 1971). This is precisely what is lacking in the part of Count I considered here. The initial garage lease was executed by one of the developer defendants as lessor and the corporation allegedly controlled by defendant Blankstein as lessee in 1964 (See Blankstein Affidavit and Exhibit A, attached to Blankstein's memorandum in support), while the building was still an apartment building. This occurred nine years before the condominium conversion, and the original term of the lease extended to 1977, a date which would have been four years after the condominium conversion. Two years after the date of the original lease, the term was extended to 1989 and another provision was added. (See Blankstein Affidavit and Exhibit B). Finally, in 1973, the year in which the condominium conversion occurred, the lease was amended one more time, to extend the term another nine years to 1998, to alter the rent formula, and to provide for reduced parking rates for the developer-defendants (See Blankstein Affidavit and Exhibit C).

When plaintiffs purchased their individual units and proportionate shares of the common elements of the condominium after the building's conversion, they took their property subject to all existing liens, encumbrances, and leases, just as does anyone who purchases real property. The garage lease was an existing encumbrance, and plaintiffs took subject to it. The lease was not a separate thing they were required to accept as a condition of purchase of their real property, but was a limitation on the estates they purchased. The factual situation is not precisely analogous to the principal case upon which plaintiffs rely. In that case, *Imperial Point Colonnades Condominium, Inc. v. Mangurian, supra,* the court in dicta acknowledged that an illegal tying agreement could be found when purchasers of condominium units were required by the Declaration of Condominium Ownership to enter into a lease of separate nearby facilities owned by the developer. Unlike the case at bar, the purchasers there were to be lessees of separate property, not simply successor lessors under a lease of part of their property already existing at the time of their purchases.

Accordingly, there being no separate products involved, we find that that part of Count I which purports to assert an agreement tying the purchase of condominium units to the lease of the garage facility in the building fails to state a claim of violation of § 1 of the Sherman Act. That part of Count I is dismissed as to all defendants.

With regard to the other part of Count I (alleging an illegal tying agreement concerning the building management contract), only the garage lessee defendants and the Invsco defendants seek dismissal. Since the garage lessee defendants rightfully assert that no allegation as to them concerning the management contract is to be found in the amended complaint, their motion to dismiss is granted as to this part of Count I as well.

The motion by the Invsco defendants, however, rests on somewhat different ground. Although plaintiffs purposefully have joined one plaintiff who claims to have

purchased her unit from the developer defendants' successors in title (See Hansen Affidavit and our order of December 23, 1977, granting leave to join her), each of the Invsco defendants state by affidavit that they have never sold any condominium units in this building and all but defendant American Invsco Management, Inc. further swear that they have never been assignees to the management contract in question. As to defendant American Invsco Management, Inc., plaintiffs have attached an Exhibit D to their memorandum in reply which indicates that this defendant *is* the assignee, so the part of Count I dealing with the management contract will not be dismissed as to the defendant American Invsco Management, Inc. in any event. But as to the remaining Invsco defendants, since the developer defendants managed to respond to the complaint and the several memoranda without ever revealing the identity of the persons or entities to whom they sold their interests in the Outer Drive East, and since plaintiffs' attorney details by affidavit his good faith research of the name Invsco to discover which Invsco corporation, if any, purchased condominium units from the developer defendants, we think that what we have here is a situation in which plaintiffs have simply not yet found the proper party. Accordingly, since, if it is true that some corporation or corporations related to these Invsco defendants must in fact be the new owner of the units formerly held by the developer defendants, the knowledge of its precise identity appears to be peculiarly within the knowledge of the Invsco defendants (and probably the developer defendants as well), that part of Count I dealing with the management contract is dismissed as to the Invsco defendants, but only upon condition that these defendants voluntarily disclose the identity of the party or parties plaintiffs seek, if they have this knowledge, or respond fully to whatever interrogatories plaintiffs may propound in this regard. Plaintiffs are given leave to reinstate this part of Count I as to these defendants within sixty days, upon failure of the condition imposed in this opinion.

■ We turn now to Count II. That count asserts that the developer defendants failed to make certain disclosures and made certain misrepresentations to plaintiffs prior to their purchases, in violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b–5 promulgated thereunder. But the viability of this claim is dependent upon our finding plaintiffs' purchases of their condominium interests to be purchases of a "security" within the meaning of the Act, as defined in 15 U.S.C. § 78c(a)(10):

> The term 'security' means any note, stock . . . bond . . . [evidence of indebtedness,] certificate of interest or participation in any profit-sharing agreement . . . *investment contract* . . . or, in general, any [interest or] instrument commonly known as a 'security'. (emphasis added)

The term "investment contract", in turn, has been broadly defined, since the landmark decision of *Securities and Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), to mean "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298, 66 S.Ct. at 1103. In the *Howey* case, the Court held that a land sale contract, a warranty deed, and a service contract, all part of the same transaction, could be considered together as comprising an "investment contract", and, therefore, a "security" within the meaning of the Securities Act of 1933. A crucial element in that decision, however, was the Court's perception that the plaintiffs there were "investors" in the sense of having joined a common enterprise, participation in which contemplated that the investors would contribute capital, third parties would contribute their efforts, and the investors would share in profits engendered thereby. That that element was central to the *Howey* holding was made clear in *United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), in which the Court held that shares of stock in

a housing co-operative did not fall within the "ordinary concept of a security", because the plaintiffs had not bargained for anything like "the right to receive dividends contingent upon an apportionment of profits". 421 U.S. at 851, 95 S.Ct. at 2060.

The Securities and Exchange Commission in 1973 issued guidelines as to when the federal securities laws may be applicable to offers and sales of condominiums or other units in a real estate development. (See first attachment to plaintiff's memorandum in opposition to defendants' motions to dismiss.) That release, No. 5347, which draws upon the SEC's interpretation of the *Howey* decision, concludes as follows:

> The offer of real estate as such, without any collateral arrangements with the seller or others, does not involve the offer of a security.

> \* \* \* \* \* \*

> The existence of various kinds of collateral arrangements may cause an offering of condominium units to involve an offering of investment contracts or interests in a profit-sharing agreement. The presence of such arrangements indicates that the offeror is offering an opportunity through which the purchaser may earn a return on his investment through the managerial efforts of the promoters or a third party in their operation of the enterprise.

> \* \* \* \* \* \*

The guidelines (on page 3) set forth three examples of rental services which constitute collateral agreements making the offering subject to the federal securities laws. The release then concludes:

> If the condominiums are not offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of others . . an owner of a condominium unit may . . . enter into a non-pooled rental arrangement with an agent not designated or required to be used as a condition to the purchase, whether or not such agent is affiliated with the offeror, without causing a sale of a security to be involved in the sale of the unit. Further, a contin-

uing affiliation between the developers or promoters of a project and the project by reason of maintenance arrangements does not make the unit a security.

In situations where commercial facilities are a part of the common elements of a residential project, no registration would be required under the investment contract theory where (a) the income from such facilities is used only to offset common area expenses and (b) the operation of such facilities is incidental to the project as a whole and are not established as a primary income source for the individual owners of a condominium or cooperative unit.

We have quoted this 1973 SEC release at length only because it addresses the problem in the case at bar so thoroughly. The SEC release is consistent with our own understanding of the *Howey* decision, and we conclude that facts alleged in the instant complaint do not support a finding that a "security" was involved here. At most plaintiffs have alleged that many purchasers were induced to buy their units by the representation that they would be a good "investment", and that some purchasers bought their units purely as an investment, that is, not to live in, but to rent out. Nowhere do we find any allegation of any collateral arrangement for this renting between the owners and any third party. Plaintiffs were simply drawn in by an expectation of appreciation in value. Plaintiffs make the tortured argument that their investment depended on the efforts of the developers in the sense that, to the extent the developers managed the commercial facilities owned by them in the building successfully, the reputation of the building would be enhanced and the value of the residential units would appreciate. But this is clearly not the kind of third-party effort envisioned by the Court in *Howey*. Further, the commercial facilities of this building fall squarely within the parameters of those the SEC in its release concludes do not make for a finding of an investment contract. Only two of the commercial facilities are alleged in the amended complaint

to be held as common elements and, indeed, plaintiffs' chief grievance is that the lease of one of them, the garage facility, is not offsetting the expenses of the common areas to the degree promised. There is no way that the amended complaint can be said to allege that the plaintiffs depended upon operation of commonly-held commercial facilities as a source of profit. The motions to dismiss are granted as to Count II.

■ Count III contains a pendent state claim based on the Illinois Condominium Property Act, Ill.Rev.Stats. Ch. 30, § 322, asserting violations of that act by failure on the part of the selling defendants to provide accurate information concerning the projected operating budget and monthly assessments of the building, the extent of the building's indebtedness, and the terms of the garage lease and management contract to the plaintiffs prior to the closings of their purchases. Defendants argue that, even if the allegations are true, Count III fails to state a claim under the Illinois Condominium Property Act because that act simply does not provide for the cause of action plaintiffs claim it does. We agree.

This statute provides very limited relief for failure to make the disclosures it requires:

> If all of the information is not available at the time of execution of the contract for sale, then the contract shall be voidable at option of the buyer at any time up until 5 days after the last item of required information is furnished to the prospective buyer, or until the closing of the sale, whichever is earlier. Failure on the part of the seller to make full disclosure as required by this Section shall entitle the buyer to rescind the contract for sale at any time before the closing of the contract and to receive a refund of all deposit moneys paid with interest thereon at the rate then in effect for interest on judgments.

Ill.Rev.Stats. Ch. 30, § 322(d).

Since all the plaintiffs in the case at bar have long since completed the closings of their condominium purchases, the relief available through this statute is simply not applicable. Plaintiffs argue that, even though it is true that the statute purports to provide for only the relief of rescission of the contract of sale prior to final closing and even though there is no reported Illinois case law saying the act allows any other kind of relief, we should take cognizance of a certain ruling by the Circuit Court of Cook County, not recorded in a written opinion, but currently pending on appeal to the Illinois Appellate Court for the First District, in which the court did grant other kinds of relief. But the statute is clear on its face; a federal court should not, and we will not, accept this invitation to shape state policy by means of the dramatic expansion of remedy urged here. The motions to dismiss are therefore granted as to Count III.

■ In Count IV, another pendent state claim, plaintiffs seek to hold the defendants liable for breach of a fiduciary duty owed to plaintiffs by virtue of defendants having variously incorporated the condominium owners' "homeowners" organization, retained control over it, promoted and sold the condominium units and managed the condominium. The developer defendants make no motion to dismiss this count. The defendants Blankstein and the corporate garage lessee, however, have moved to dismiss on the ground that it fails to state a claim as to them.

Paragraphs 47 to 50 of the amended complaint contain the allegations in regard to Blankstein and the corporate defendant. These are, in sum, that, despite Blankstein's knowledge of facts from which he should have been aware that the developers were in a fiduciary relationship with the purchasers and prospective purchasers of the condominium units, and from which he should have been aware that the 1973 garage lease amendment worked to the detriment of these purchasers, he nonetheless induced and conspired with the developer defendants to enter into the lease amendment. We think these allegations do state a claim against defendants Blankstein and Outer Drive East Garage, Inc., and therefore their motion to dismiss is denied.

As to the Invsco defendants, the sole basis for their motions to dismiss Count IV is the same as that as to Count I, namely, their affidavits stating that none of them had ever sold any of the condominiums involved here. For the reasons expressed earlier in this opinion, dealing with Count I, the motion to dismiss by defendant Invsco Management, Inc. is denied, and the motions of the other Invsco defendants is granted upon the same conditions imposed with regard to Count I.

In summary, the motion by defendants Nationwide Industries, Inc., Nationwide Condominium Corporation, Moss Financial Corporation, Outer Drive East Corporation, Randolph-Outer Drive Venture, Jupiter Industries, Inc., Wexler, Moss, and NCC, Inc. to dismiss that part of Count I dealing with the garage lease, and all of Counts II and III is granted. The motion to dismiss by defendants Blankstein and Outer Drive East Garage, Inc. is granted as to Counts I, II and III, and denied as to Count IV. The motion to dismiss by defendant American Invsco Management, Inc. is denied as to that part of Count I dealing with the management contract and as to Count IV, and granted as to Counts II and III, and as to that part of Count I dealing with the garage lease. The motions to dismiss by defendants American Invsco Corporation, American Invsco Realty, Inc., and American Invsco Insurance Services, Inc. are granted as to that part of Count I dealing with the garage lease and as to Counts II and III, and are granted as to Count IV and as to that part of Count I dealing with the management contract, but only upon condition they volunteer or otherwise provide certain information, if known, as outlined in this opinion. Plaintiffs have leave to reinstate these parts of the amended complaint as to these defendants within sixty days, upon failure of this condition.