Florence BENDER, Plaintiff,

v.

CONTINENTAL TOWERS LIMITED
PARTNERSHIP, et al.

No. 85 Civ. 5725.

United States District Court,
S.D. New York, S.D.

April 4, 1986.

Scott E. Mollen, Lawrence D. Bernfeld, Alan A. Harley, Graubard Moskovitz Dannett Horowitz & Mollen, New York City, for defendants.

Gerald J. Hurwitz, New York City, for Robert Abrams.

Edward S. Kanbar, New York City, for plaintiff.

## OPINION

GRIESA, District Judge.

This action is brought by nine tenants opposed to the conversion to condominium ownership of the building in which they rent apartments. The complaint alleges violations of the federal securities laws and the RICO statute by the converting parties, and violation of plaintiffs' civil rights by the Attorney General of the State of New York.

The converting parties, Continental Towers Limited Partnership, American Invsco Corporation and 79th Towers, Inc., move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), Federal Rules of Civil Procedure. The Attorney General also moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). The motions are granted with respect to the first and fourth counts. The second and third counts are dismissed with leave to replead within 60 days. The case is terminated entirely as to the Attorney General. The other defendants are subject to the possible repleading of the second and third counts.

### The Parties

The building in question is the Continental Towers, located at 301 East 79th Street, New York City. The nine tenant plaintiffs purport to bring this as a class action. However, the present motions are being entertained prior to any decisions on certification of class action status under Local Civil Rule 4(c).

Defendant Continental Towers Limited Partnership ("Continental") is the sponsor of the offering plan for the conversion of the apartment building to condominium ownership. Continental is an Illinois limited partnership authorized to do business in New York, with its principal office at 301 East 79th Street.

Defendant American Invsco Corporation ("Invsco") allegedly owns all the shares of stock of 79th Towers, Inc. Invsco is a Delaware corporation with its principle office in Chicago, Illinois.

Defendant 79th Towers, Inc. ("79th Towers") is the selling agent for Continental and allegedly is its sole general partner. 79th Towers is a New York corporation with its principle office at 301 East 79th Street.

Defendant Robert Abrams is the Attorney General of the State of New York. The Attorney General reviewed the offering plan before it became effective to ensure compliance with state law.

Defendants Roseanne Giannone and Roberta Liss allegedly own or control apartments in the building.

### Plaintiffs' Allegations

The amended complaint alleges that Continental acquired the subject apartment building in April, 1981 at a cost of approximately $42,000,000, and that in December, 1984 Continental filed with the Attorney General a plan to convert the rental apartments to 532 individual condominium units, the total price of the 532 condominiums being approximately $140,000,000. Under the offering plan, tenants who decline to purchase an apartment can be evicted.

It is alleged that the offering plan provides that tenants can purchase apartments at an "insider" price, a price discounted from what the plan represents as the market price available to "outsiders," and that most of the tenants polled by the Tenants

Association indicated that they would not or could not buy at the prices set by Continental. Plaintiffs allege that the Tenants Association obtained "no-buy pledges" from 58% of the tenants, thereby ensuring that they could not be evicted, because an eviction plan requires subscriptions to buy from more than half the tenants.

The amended complaint alleges that in an effort to undermine the no-buy pledges, Continental "committed many illegal acts of threats, misinformation and favorable dealings," and that on April 4, 1985, the attorney who drafted the no-buy pledges informed the steering committee of the Tenants Association that they "could be in serious legal trouble" if they did not release the tenants from their no-buy pledges. Amended Complaint ¶ 19. It is alleged that the steering committee issued a letter releasing the tenants from the no-buy pledges on April 4, 1985, without stating why the tenants were released from their pledges. Plaintiffs claim that the conditions required for release of the no-buy pledges were not met.

The amended complaint alleges that the tenants were then forced to decide in five days, over the Easter and Passover weekend, whether to subscribe to the offering plan or to "somehow lose their rights as tenants and their rights to insider prices under the Plan." Amended Complaint ¶ 22. It is claimed that the plan provides that a tenant could subscribe by making a deposit of $1,000, and that the tenant would not be liable for the balance of the purchase price if he decided to withdraw from the offering plan. Tenants were also told that they "would be allowed to remain for some time before eviction" if they declined to purchase a condominium after placing a deposit. In the five days between April 4 and April 9, 1985, Continental obtained more than 200 subscriptions from tenants to buy their apartments.

Plaintiffs allege that Continental, Invsco and 79th Towers misrepresented various material aspects of the plan to convert the apartment building to condominium ownership. Plaintiffs contend that these misrepresentations were made in connection with an offer of securities, in violation of the federal securities laws. Plaintiffs further contend that these misrepresentations and other complained of acts constitute a pattern of racketeering activity by Continental, Invsco and 79th Towers, in violation of the RICO statute. Defendants Roseanne Giannone and Roberta Liss are charged with conspiring with Continental, Invsco and 79th Towers to violate RICO. Finally, plaintiffs contend that Attorney General Robert Abrams violated their civil rights in violation of 42 U.S.C. § 1983 by allegedly failing properly to review the condominium conversion plan submitted by Continental.

*The Claims*

a. *Federal Securities Laws*

Plaintiffs' first claim is that Continental, Invsco and 79th Towers violated the federal securities laws by failing to register the offering of the condominiums with the Securities and Exchange Commission and by misrepresenting numerous material aspects of the offering plan to the prospective buyers.

The threshold question is whether the condominium conversion plan involved the offer of a security within the meaning of the federal securities laws. Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), defines the term security as follows:[1]

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest therein in oil, gas, or other mineral rights, any put,

---

**1.** This definition of a security is "virtually identical" to the definition contained in § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 842 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

call, straddle, option, or privilege on any security, certificate of deposit or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency or, in general any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. (emphasis added).

Plaintiffs do not allege that any shares of stock were offered here, in substance or in form. Rather, plaintiffs contend that the subscriptions made by tenants, accompanied by the $1,000 deposit, constitute investment contracts. However, plaintiffs have cited not a single case finding that a condominium conversion plan involved the offer or sale of investment contracts. Instead, plaintiffs merely note that the cases do not *foreclose the possibility* that on an appropriate set of facts a condominium conversion plan might be found to involve the offer or sale of securities.

The Supreme Court first defined the term "investment contract" in *S.E.C. v. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey*, the Court stated that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profit solely from the efforts of the promoter or a third party." 328 U.S. at 298–99, 66 S.Ct. at 1103. An investment contract was found in *Howey* where the defendant sold land containing citrus groves, together with contracts under which defendant would cultivate the groves, market the citrus and remit the net proceeds to the investor. On these facts, the purchasers of the land contracts were "attracted solely by the prospects of a return on their investment." 328 U.S. 300, 66 S.Ct. 1103. The purchasers had no desire to occupy the land or develop it themselves. The purchasers were wholly dependant on the promoters to make the groves profitable. Thus, it was held that investment contracts were involved.

The meaning of the term "investment contract" was considered again by the Court in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). This case involved an offering of stock in a cooperative apartment corporation. The purchase of the stock of the cooperative corporation was a prerequisite to leasing an apartment in the cooperative. The Court held that the cooperative's stock was not "stock" within the meaning of the federal securities laws because it bore none of the traditional indicia of stock. The mere labelling of the shares of the cooperative as "stock" did not bring the shares within the ambit of the federal securities laws. 421 U.S. at 848–51, 95 S.Ct. at 2058–60. The Court went on to consider whether the shares constituted investment contracts. The Court stated that "when a purchase is motivated by a desire to use or consume the item purchased ... the securities laws do not apply." 421 U.S. at 853, 95 S.Ct. at 2061. Finding that the cooperative shares were purchased not with an eye toward profit, but to acquire a place to live, the court held that the shares did not constitute investment contracts.

Under the definition of "investment contract" as developed by the Court in *Howey* and *Forman*, the sale of a condominium generally would not involve an investment contract. *Johnson v. Nationwide Industries, Inc.*, 450 F.Supp. 948 (N.D.Ill.1978), *aff'd*, 715 F.2d 1233 (7th Cir.1983); *Mosher v. Southridge Associates, Inc.*, 552 F.Supp. 1231 (W.D.Pa.1982). Plaintiffs contend, however, that on the facts of this case the plan to convert to condominiums, ownership does involve investment contracts. Plaintiffs contend that the sales of condominium to purchasers who allegedly did not intend to reside in their condominiums constitute investment contracts. Plaintiffs also contend that the $1,000 deposit placed by many tenants constitutes an option to buy a condominium. These options are considered by plaintiffs to be investment

contracts. Plaintiffs allege that these options were freely transferable, and that more than half the tenants bought the options with the intention of transferring the options at a profit. The value of the options would of course be tied to the value of the underlying condominiums. Plaintiffs allege that the value of these condominiums is controlled by Continental in various ways. Plaintiffs further allege that Continental emphasized to the tenants the possibility of selling the options at a profit.

■ Neither the contracts to purchase condominiums nor the alleged options to buy condominiums constitute investment contracts. The mere allegation that investors purchased condominiums and tenants purchased options with the intention of reselling at a higher price does not bring these transactions within the ambit of the federal securities laws. *Mosher, supra,* (dismissing securities violation complaint alleging that plaintiffs purchased a condominium as an investment in reliance on defendant's promise to promote the investment). The tenants here did not expect to earn profits "solely from the efforts of a promoter or a third party." *Howey, supra.* Rather, the tenants "were simply drawn in by an expectation of appreciation in value." *Johnson,* 450 F.Supp. at 953.

The sort of "efforts" of a promoter envisioned in the *Howey* test are activities such as the organization of a business, the efforts of a promoter in cultivating and marketing citrus, *Howey, supra,* the efforts of a promoter in drilling an exploratory well in connection with the sale of oil leases, *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), or the efforts of the managers of a savings and loan to earn profits to be distributed as dividends, *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). In each case, without the efforts of the promoters, the investments would be virtually worthless. For this reason Congress thought it necessary to afford such investors the protection of the securities laws.

■ Here, plaintiffs allege that Continental influenced the value of the condominium units through its marketing efforts and its own buying and selling strategies. But these efforts by Continental would have at most only a marginal effect on the value of the condominium units. As the second circuit pointed out in connection with another apartment building in *Grenader v. Spitz,* 537 F.2d 612, 617 (2d Cir.), *cert. denied,* 429 U.S. 1009, 97 S.Ct. 541, 50 L.Ed.2d 619 (1976), the value of the units "[r]ealistically ... will depend upon the general housing market, the status of the neighborhood and the availability of credit." A piece of real estate, such as a condominium, has an inherent worth, a worth not solely dependent on the efforts of a promoter. For this reason, real estate transactions are not in and of themselves governed by the federal securities laws.

■ Real estate transactions might involve an offer of securities in those cases where an investor is offered both real estate *and* a collateral expectation of profits. *See Forman,* 421 U.S. at 853 n. 17, 95 S.Ct. at 2061 n. 17. This problem is dealt with in an S.E.C. release cited in *Forman.* S.E.C. Release No. 33–5347, 38 Fed.Reg. 1735 (January 18, 1973). The release states plainly that "[t]he offer of real estate as such, without any collateral arrangements with the seller or others, does not involve the offer of a security." 38 Fed.Reg. at 1735. A security would be involved, according to the release, only in those situations where condominiums are sold to investors with emphasis on the economic benefit to the investors of renting out the condominium through the offices of the condominium management or their agents. In such cases, investors are purchasing, in addition to real estate, the right to an income stream of rental profits, profits dependent on the efforts of the rental agents. Plaintiffs do not allege that this sort of rental scheme is involved in the condominium conversion of their apartment building. *See generally Mosher, supra* (finding sale of a condominium not to be sale of a security under release guidelines); *Johnson, supra* (same).

■ The condominium conversion complained of here involves only the transfer of title to real estate, not the transfer of any securities. Plaintiffs' securities claim is dismissed.

Plaintiff's have not been without protection. The condominium conversion of their building is regulated by the Martin Act, N.Y.Gen.Bus. § 352 *et seq.* (McKinney 1984), a law containing provisions specifically addressed to the condominium conversion process. The state courts have already considered the legality of the condominium conversion process here under this and other state laws. There is no need to apply the federal securities law to this alien context. *See International Brotherhood of Teamsters v. Daniels,* 439 U.S. 551, 569–70, 99 S.Ct. 790, 801–02, 58 L.Ed.2d 808 (1979) (holding employee's interest in a pension plan not to be a security interest in part because the Employee Retirement Income Security Act of 1979, 29 U.S.C. § 1001 *et seq.,* "deals expressly and in detail with pension plans."); *Marine Bank v. Weaver,* 455 U.S. 551, 559, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982) ("[i]t is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws.")

### b.  *RICO*

■ The second count of the amended complaint claims a violation by defendants Continental, Invsco and 79th Towers of § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. The third count of the amended complaint alleges that defendants Continental, Invsco and 79th Towers and defendants Roseanne Giannone, Roberta Liss and "others not presently known" conspired to violate the RICO statute. 18 U.S.C. §§ 1962(c) and (d).

The pleading of the RICO claims is improper. The second count consists mainly of a lengthy recitation of alleged wrongdoing by Invsco in connection with transactions and condominium conversions having nothing whatever to do with plaintiffs. The allegations concerning the condominium conversion complained of here are vague. The complaint states that "[i]n the instant action, Invsco is repeating most of the illegal and improper actions of its past." As a further allegation of racketeering activity, the second count incorporates by reference all of the allegations made in connection with the securities count. The second count is also flawed for failing to specify precisely what entities constitute the enterprise through which the defendants allegedly engaged in a pattern of racketeering activity. The third count suffers similar infirmities.

The second and third counts are dismissed with leave to replead within 60 days. The repleading must be limited to specific allegations of illegalities affecting the plaintiffs to this lawsuit—*i.e.,* the repleading must allege specific acts constituting specified racketeering activities in connection with the condominium conversion at issue here. The repleading must precisely specify which of these acts constitute the predicate acts establishing the requisite "pattern of racketeering activity." To be sufficient, the repleading must also specify exactly which entities comprise the alleged enterprise. After repleading, the court will consider whether plaintiffs have stated a legally cognizable RICO cause of action.

### c.  *Civil Rights Law*

■ The fourth count of the amended complaint alleges that Attorney General Robert Abrams violated the civil rights of plaintiffs in violation of 42 U.S.C. § 1983. Specifically, the fourth count alleges that Abrams is charged with the duty of enforcing the registration requirements of condominium conversion plans, and that he failed properly to exercise this duty by failing to obtain full disclosure of various matters relevant to the offering plan. Plaintiffs contend that Abrams' failure to discharge his duties under the law of New York constitutes a violation of the civil rights of plaintiffs, in violation of 42 U.S.C. § 1983.

The civil rights allegedly violated are not specified in the complaint.

To establish a claim under § 1983, plaintiffs must show (1) that "the conduct complained of was committed by a person acting under color of state law" and (2) that "this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Parrat v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). As defendant Abrams plainly acted under color of state law, the only issue is whether plaintiffs were deprived of some right, privilege or immunity secured by the Constitution or laws of the United States.

Plaintiffs contend that Abrams deprived them of their property without due process of law by failing properly to apply state law regulating the condominium conversion process. The court will assume without deciding that the condominium conversion process affects some property right of the plaintiffs. The question to be addressed is whether the alleged deprivation of plaintiffs' property rights occurred without due process of law.

Plaintiffs' claim is not like the usual § 1983 claim because it is not alleged here that the state directly deprived plaintiffs of their property. Rather, plaintiffs claim that by approving the offering plan without exacting from Continental all of the disclosure allegedly mandated by state law, the state enabled the private defendants to deprive plaintiffs of their property. The court need not decide whether such an allegation states a cause of action against a state under § 1983, because the court finds that plaintiffs here were afforded full due process protection.

The actions of defendant Abrams are fully reviewable through an Article 78 proceeding in the state courts. N.Y.Civ. Prac.Law § 7801 *et seq.* (McKinney 1981). Section 7803 provides the mechanism by which an aggrieved party can assert that a state administrative determination was made in violation of lawful procedure or was arbitrary or capricious or an abuse of discretion. Plaintiffs contend that the Arti-cle 78 procedure does not provide them with a meaningful opportunity to challenge the Attorney General's decision. The Article 78 procedure is alleged not to be meaningful because under it the "tenants are burdened with establishing the evidence with which to proceed in their legal action." Affirmation of Edward S. Kanbar ¶ 19.

The court concludes that the Article 78 procedure affords plaintiffs all the process to which they are due. Because New York provides adequate procedures for the review of the actions of its officials, it cannot be said that plaintiffs were deprived of their property rights without due process of law. The fourth count is dismissed.

*Conclusion*

The motions by defendants Continental, Invsco and 79th Towers and defendant Abrams to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) are granted with respect to the first and fourth counts. The second and third counts are dismissed with leave to replead within 60 days. The case against the Attorney General is entirely dismissed. The remaining defendants are subject to the possible repleading of the second and third counts.

So ordered.