The **DUMBARTON CONDOMINIUM ASSOCIATION, Plaintiff,**

v.

**3120 R STREET ASSOCIATES LIMITED PARTNERSHIP, et al., Defendants.**

**Civ. A. No. 86–2487.**

United States District Court, District of Columbia.

March 23, 1987.

**MEMORANDUM**

GASCH, Senior District Judge.

## I. INTRODUCTION

In this action, plaintiff Condominium Association has sued 3120 R Street Associates, U.S. Enterprises, Inc. and Klaus Schuermann in their capacity as developers of property known as The Dumbarton Condominium at 3120 R Street, N.W., Washington, D.C. The counts in the complaint include a multitude of common law allegations, such as breach of warranty, negligence and breach of fiduciary duty, as well as one claim in count eight that defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The matter at bar centers upon the availability of the RICO claim as jurisdiction in this Court rests entirely upon the RICO allegations.

## II. FACTUAL AND STATUTORY BACKGROUND

This lawsuit arises out of a dispute between the unit owners at The Dumbarton Condominium and the Condominium's developer regarding alleged structural defects in the condominiums.[1] Plaintiff claims jurisdiction in this Court pursuant to the federal RICO statute with pendent jurisdiction over the state claims. Specifically, count eight of the complaint alleges that defendant Schuermann has engaged in numerous fraudulent activities in the sale of condominium units at The Dumbarton Condominium. Plaintiff asserts that the sale of these units by Schuermann was a "sale of securities." The complaint states that, with regard to these sales, Schuermann promised numerous amenities, repairs, and improvements that have never been made and that Schuermann misrepresented that certain common elements were included with the units for sale. As a result of this conduct, plaintiff claims it is entitled to receive $4 million in damages, three million

Jeffrey M. Axelson and Bruce M. Bender, Rockville, Md., for plaintiff.

Craig B. Young and Mark Brodsky, Washington, D.C., for defendants.

1. The counts in the complaint include: (1) breach of implied warranty of structural defects on common elements; (2) negligence of developer; (3) negligent misrepresentation; (4) deceit; (5) breach of fiduciary duty; (6) strict liability; (7) attachment before judgment; and (8) violation of RICO.

of which is punitive in nature, together with costs.

In this motion, defendants first argue that the RICO count must be dismissed because a sale of condominiums is not included in the definition of "racketeering activity" in the Act. Defendants urge that since plaintiff's claims do not fall within the reach of RICO, count eight of the complaint should be dismissed. Defendants further note that, as jurisdiction in this Court depends upon the RICO count, the other state law claims should be dismissed for lack of subject matter jurisdiction. Defendants' second major contention is that counts four, seven and eight should also be dismissed because plaintiff has failed to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b).[2] In sum, the principal question before the Court is whether defendants' sale of condominium units may be considered a sale of securities and thereby be included as an activity covered by the RICO provisions.

Under RICO, "any person injured in his business or property by reason of a violation of section 1962" may sue for treble damages in district court. 18 U.S.C. § 1964(c) (1979 & 1986 Supp.). In turn, section 1962 makes it unlawful for any person to receive "any income derived, directly or indirectly, from a pattern of racketeering activity...." In section 1961, Congress defined "racketeering activity" quite broadly. The term encompasses numerous generic offenses under state and federal criminal law, such as murder, gambling, bribery, mail and wire fraud. "Racketeering activity" also includes "any offense involving ... fraud in the sale of securities...." 18 U.S.C. § 1961(1)(D) (1986 Supp.).

The common law history behind the RICO provisions is long. The statute, broadly drafted by Congress, has been utilized by claimants in numerous and diverse factual settings. With regard to this particular RICO claim, the ensuing discussion will be limited to the threshold issue of whether the sale of condominium units falls within the definition of "racketeering activity" as a "sale of securities."

## III. DISCUSSION

Plaintiff alleges that Schuermann's acts constitute "fraud in the sale of securities ... punishable under any law of the United States." 18 U.S.C. § 1961(1)(D). The securities sold by Schuermann, alleges plaintiff, were the condominium units at The Dumbarton Condominium.

RICO itself does not define the term "securities." Plaintiff, moreover, does not point to a particular federal law under which defendants' acts would be punishable. The term "security" is defined in the Securities Act of 1934 as follows:

The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (1983) (emphasis added; this definition is largely mirrored in the

---

**2.** Since the viability of the RICO allegations is dispositive of the motion at bar, the Court need not rule on the second issue presented by defendants, namely, plaintiff's failure to plead fraud with particularity.

Securities Act of 1933, 15 U.S.C. § 77b(1) (1975)).

The defendants note that this definition makes no mention of the sale of a fee simple interest in real estate. The definition, however, does mention the term "investment contract" as included within the meaning of the term "security." Both parties point to the considerable case law discussing whether various land or condominium sales constituted "investment contracts" and were thus sales of securities. It is this body of case law to which the Court now turns.

It is true that a determination of whether an "investment contract" exists depends largely on the facts of a given case. The Supreme Court has recognized that the concept is flexible, not static. *See SEC v. Howey, Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). In *Howey*, the Supreme Court first defined the term "investment contract" stating that

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profit solely from the efforts of the promoter or a third party,....

328 U.S. at 298–99, 66 S.Ct. at 1103. Thus, it is clear that the *Howey* decision sets forth three requirements for an investment contract: (1) that a person invests money; (2) in a "common enterprise"; and, (3) expects profits solely from the promoter's efforts.

In *Howey*, an investment contract was found where defendant sold land interests in citrus groves, together with management service contracts under which defendant would cultivate the groves, market the citrus and allocate net profits to the inves-

tors. The facts in that case indicate that the purchasers of the land contracts were "attracted solely by the prospects of a return on their investment." *Id.* at 300, 66 S.Ct. at 1103. Similarly, in *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), sales of leasehold rights were determined to be investment contracts where purchasers obtained not "naked leasehold rights" but shares in the discovery value of oildrilling explorations conducted by the promoters.[3] *Id.* at 348–49, 64 S.Ct. at 122. In *Joiner*, "[t]he land itself was purely an incidental consideration in the transaction." *United Housing Foundation Inc. v. Forman*, 421 U.S. 837, 853 n. 18, 95 S.Ct. 2051, 2061 n. 18, 44 L.Ed.2d 621 (1975).

In *Forman*, the Supreme Court again considered the meaning of the term "investment contract." That case involved the offering of "stock" in a cooperative apartment corporation. Purchasing this stock was a prerequisite to leasing an apartment in the cooperative. The Supreme Court held that these "shares of stock" had none of the traditional indicia of stock and were not securities simply because they were labelled as such. *Id.* at 848–51, 95 S.Ct. at 2058–60. Turning to the issue of whether the stock constituted investment contracts, the Court found that "when a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it [himself]' ... the securities laws do not apply." *Id.* at 852–53, 95 S.Ct. at 2060–61 (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 300, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946)). As these co-op shares were bought with the intention of acquiring a place to live, the Court held that the agreements to purchase shares were not investment contracts.[4]

---

**3.** The Court stated:

The drilling of this well was not an unconnected or uncontrolled phenomenon to which salesmen pointed merely to show the possibilities of the offered leases. The exploration enterprise was woven into these leaseholds, in both an economic and legal sense; the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung.

*Joiner*, 320 U.S. at 348, 64 S.Ct. at 122.

**4.** "What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use." *Forman*, 421 U.S. at 858, 95 S.Ct. at 2063.

■ It is apparent from the foregoing Supreme Court decisions that a reviewing court must examine the nature of the property interest purchased by plaintiffs in order to determine if an investment contract exists. The *Howey* opinion spelled out three elements of an investment contract, of which the third is clearly the most problematic in the case at bar. The third element requires that the investor "is led to expect profits solely from the efforts of the promoter or third party." *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1103. As one district court noted:

> The sort of "efforts" of a promoter envisioned in the *Howey* test are activities such as the organization of a business, the efforts of a promoter in cultivating and marketing citrus, *Howey, supra,* the efforts of a promoter in drilling an exploratory well in connection with the sale of oil leases, *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), or the efforts of the managers of a savings and loan to earn profits to be distributed as dividends, *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

*Bender v. Continental Towers Ltd. Partnership,* 632 F.Supp. 497, 501 (S.D.N.Y. 1986). In each of the instances mentioned in *Bender,* the investments would be virtually worthless without the promoter's efforts. *Id.*

■ In the case at bar, plaintiff tenants' association is comprised of purchasers who bought condominium units both as investments and as residences. *See* Plaintiff's Opposition Brief at 5 n. 1. Plaintiff has supplied three affidavits of purchasers who state that they do not reside in their units, buying them instead for "investment purposes" and in reliance on Schuermann's representations.[5] Plaintiff alleges that defendant Schuermann has adversely influenced the value of the units by failing to correct defects and to provide amenities.

This case does not seem to involve the sort of managerial control over an investment contemplated by the Supreme Court decisions. There is no indication on the record that Schuermann promised to market, develop, sell or lease these properties on behalf of "passive" investors and in exchange for their investment.[6]

■ In other words, the condominium unit purchasers involved here were not led to expect "profits" from the promotional efforts of Mr. Schuermann. Rather, they were led to expect a certain standard of quality and maintenance of the property they purchased. Such an expectation often attends the purchase of a fee simple interest in real estate but does not necessarily indicate that a sale of securities occurred.

Other lower federal courts have found that the average sale of a condominium unit to a purchaser, without a promoter's continuing managerial oversight of the "investment," is a real estate transaction, not a sale of securities. Numerous cases, including the Supreme Court's *Forman* decision, have been guided by the SEC's own statement on this issue in SEC Release No. 83–5347, 38 Fed.Reg. 1735 (January 18, 1973). *See Forman,* 421 U.S. at 853 n. 17 and 858 n. 25, 95 S.Ct. at 2061 n. 17 and 2063 n. 25; *Bender,* 632 F.Supp. at 501; *Mosher v. Southridge Associates, Inc.,* 552 F.Supp. 1231, 1232–33 (W.D.Pa.1982).

This release plainly states that "[t]he offer of real estate as such, without any collateral arrangements with the seller or others, does not involve the offer of a security." 38 Fed.Reg. at 1735. The Commission articulated types of "collateral agreements" as they pertain to condominium sales:

> 1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of

---

5. *See* Affidavits of Joann and Nancy Lewinsohn and Jack Mula, attached as Exhibits 1–3, Plaintiff's Opposition Brief. The Affidavit of Terry E. Johnson, attached as Exhibit 1 to Plaintiff's Reply, does not state that he does not live in the purchased unit.

6. One affidavit states that one unit owner leased back his unit to Schuermann for a one year period at a fixed rent. This appears to be a straightforward landlord/tenant arrangement and not an indication of managerial control.

the promoter, or a third party designated or arranged for by the promoter, from rental of the units.

2. The offering of participation in a rental pool arrangement; and

3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

38 Fed.Reg. at 1736.

In light of these SEC guidelines, no "collateral agreements" exist in the case at hand and, accordingly, the Court finds that the instant transactions are outside the definition of a security. First, plaintiff does not allege that the unit owners' purchase of condominiums was conditioned upon participation in a rental program. Second, plaintiff's affiants do not declare that their rental decisions were bound by an agreement to use a particular rental agent. Third, there is no evidence in this case that any of the condominium sales agreements contemplated the pooling of rental payments. Lastly, there is no suggestion by plaintiff that Schuermann limited the right of unit owners to use their unit as they pleased. In short, there are no collateral agreements beyond the agreement to sell certain condominium properties. Thus, no transfer of securities ensued.

Additionally, other federal courts facing the issue of whether a sale of condominium units was a sale of securities have held that even where the seller influences the value of condominium units through marketing efforts, the value of the units

... '[r]ealistically ... will depend upon the general housing market, the status of the neighborhood and the availability of credit.' A piece of real estate, such as a condominium, has an inherent worth, a worth not solely dependent on the efforts of a promoter.

*Bender,* 632 F.Supp. at 501 (quoting *Grenader v. Spitz,* 537 F.2d 612, 617 (2d Cir.), *cert. denied,* 429 U.S. 1009, 97 S.Ct. 541, 50 L.Ed.2d 619 (1976)).

In *Bender,* a district court held that a condominium conversion plan did not involve the transfer of securities where there were no collateral arrangements as described in SEC Release No. 83–5347. In *Mosher, supra,* 552 F.Supp. at 1232, the district court held that a sale of a condominium was not a sale of a security even though purchasers allegedly relied on the vendor's promises that the investment would increase in value because of his activities in developing, promoting or managing the investment. Again, the *Mosher* court turned to the SEC guidelines and found no collateral agreements in the condominium sale. The court in *Mosher* found that plaintiff had not alleged sufficient facts to sustain a cause of action under the Securities Act and therefore dismissed that claim along with pendent state claims. *Id.* at 1233.

In another decision, a district court held that purchasers of condominium units were not purchasing "securities," despite the contention that some purchasers bought their units to rent out, not to live in. *Johnson v. Nationwide Industries, Inc.,* 450 F.Supp. 948 (N.D.Ill.1978). The court found that plaintiffs failed to allege the existence of any collateral agreements, pursuant to the SEC release, and that plaintiffs "were simply drawn in by an expectation of appreciation in value." *Id.* at 953. This same conclusion may easily be made in the instant case. Moreover, the Court in *Johnson* rejected plaintiffs' "tortured argument" that their investment depended upon the seller's management of some of the common elements in the building. *Id.* at 953–54. In *Johnson,* the court reflected on the *Howey* decision, stating that

A crucial element in that decision ... was the Court's perception that the plaintiffs there were "investors" in the sense of having joined a common enterprise, participation in which contemplated that the investors would contribute capital, third parties would contribute their efforts, and the investors would share in the profits engendered thereby.

*Id.* at 952. In the case at hand, no facts have been alleged to suggest a "common

enterprise" between plaintiff and Schuermann.

Plaintiff's assertion that several cases are controlling is incorrect. First, plaintiff claims that a Tenth Circuit case controls which found that sales of undeveloped lots were "investment contracts" and thus constituted a sale of securities. *McCown v. Heidler*, 527 F.2d 204, 211 (10th Cir.1975). That holding rested upon evidence that plaintiffs had invested in more than real estate. The sellers in that case allegedly had promised to use purchase money from lot sales to make substantial improvements to the land: constructing a country club, an 18–hole golf course, an equestrian center, tennis courts, clubhouses and swimming pools. *Id.* at 209. This type of scheme, or "common enterprise," has simply not been alleged by plaintiff in the instant case.

Second, plaintiff's reliance on *Wooldridge Homes, Inc. v. Bronze Tree, Inc.*, 558 F.Supp. 1085 (D.Colo.1983), is misplaced. That case is distinguishable from the facts in the case at hand because the condominium sales included collateral agreements such as a pooling of rental commitments. *Id.* at 1087. Again, in *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir.1980), the Tenth Circuit found that plaintiffs sufficiently alleged facts to preclude a Rule 12(b) motion. There, however, plaintiffs claimed that the vendors promised substantial improvements to undeveloped lots. Although the court felt that "[a] security is not always an easily recognized creature," it noted that:

> [T]he obligation to perform minimum managerial functions does not transform a real estate sale into a securities transaction. The real burden of management and development, even by the most liberal tests, must rest on the developers.

*Id.* at 1040.

## IV. CONCLUSION

In sum, the Court concludes that the plaintiff association has not alleged sufficient facts even to suggest that Schuermann had more than minimum managerial functions at The Dumbarton Condominium. The condominium unit purchasers here at issue bought interests in real estate only. No "investment contracts" were entered into and, therefore, no securities transactions were involved. Thus, plaintiff has failed to demonstrate that defendants' activities fall within the definition of "racketeering activity" in RICO. Accordingly, the RICO claim in Count VIII of the complaint is dismissed. Dismissing the RICO count necessarily entails dismissing the remaining pendent state claims for want of subject matter jurisdiction. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).