Roslyn O. BEAUFORD, Leonard Grossman, Maria Valle, Joseph Decesare, Jr., and Elsie Decesare, individually and on behalf of others similarly situated, Plaintiffs,

v.

Harry B. HELMSLEY, Leona M. Helmsley, Joseph V. Licari, Supervisory Management Corp., Helmsley Enterprises, Inc., Avenue of America Realty Corp., Benenson Capital Co., Sanfurd G. Bluestein, Felice Earley, Estate Associates, Joan Konner, Peter L. Malkin, John J. Reynolds, Inc., Saul S. Silverman, William C. Warren, William C. Breed, III, Ralph W. Felsten, Lillian M. Gelfman, Robert W. Gelfman, Donald L. Jonas, Jeffrey D. Klein, Norman R. Klein, Alvin S. Lane, Fred Linden, Gertrude G. Malkin, Peter L. Malkin,

Claire W. Morse, Lester S. Morse, Jr., Richard P. Morse, Ivan Shapiro, Alvin Silverman, Harold L. Strudler, Parkchester Management Corp., Brown Harris Stevens, Inc., and Deco Purchasing and Distributing Co., Inc., Defendants.

No. 86 Civ. 7115 (RWS).

United States District Court, S.D. New York.

June 6, 1990.

---

Edward S. Kanbar, New York City, for plaintiffs.

Shea & Gould, New York City (Michael S. Feldberg, of counsel), for defendants Harry B. Helmsley, Leona M. Helmsley, Supervisory Management Corp., Helmsley Enterprises, Inc., John J. Reynolds, Inc., Brown Harris Stevens, Inc. and Deco Purchasing and Distributing Co., Inc.

Wien, Malkin & Bettex, New York City, for defendants Peter L. Malkin, Ralph W. Felsten and Alvin Silverman.

## OPINION

SWEET, District Judge.

This action is before the court on the motion of plaintiff Leonard Grossman ("Grossman") for a preliminary injunction and on cross-motions to dismiss brought by defendants Harry B. and Leona M. Helmsley ("Helmsley"), Supervisory Management Corp. ("SMC"), Helmsley Enterprises, Inc.,

John J. Reynolds, Inc., Brown, Harris, Stevens, Inc., Deco Purchasing and Distributing Co., Inc. (the "Helmsley defendants"), and by Peter L. Malkin, Ralph W. Felsten, and Alvin Silverman. For the reasons discussed below, the motion for a preliminary injunction is denied, the cross-motion of the Helmsley defendants is granted, and the complaint is dismissed.

*Nature of the Action, Parties, and Prior Proceedings*

Plaintiffs own or reside as tenants in units of a massive residential complex in the Bronx known as the Parkchester. They seek damages and injunctive relief in connection with alleged fraudulent misrepresentations made in connection with the conversion and management of the southern half of the residential complex. This 135–building structure, containing 8,286 apartments, is in its present condominium form formally termed The Parkchester South Condominium, Inc. (hereinafter "Parkchester South" or the "Condominium"). Claims under RICO, the federal antitrust laws, the federal securities laws, the Interstate Land Sales Full Disclosure Act, and several state laws are asserted against the thirty-five defendants.

The original complaint was filed in September 1986 and amended in October 1986. The parties to the first amended complaint and the essential allegations set forth therein were outlined in the court's opinion of December 12, 1986 dismissing the action after finding that the federal RICO and securities causes pleaded therein (and as sought to be further amended by plaintiffs) failed to state a claim upon which relief could be granted. Further elucidation of the complaint is contained in the *en banc* opinion of the Court of Appeals reversing the district court dismissal on the ground that the complaint adequately pleaded RICO elements of pattern and continuity. *See Beauford v. Helmsley,* 650 F.Supp. 548 (S.D.N.Y.1986), *aff'd,* 843 F.2d 103 (2d Cir. 1988), *reversed upon rehearing en banc,* 865 F.2d 1386 (2d Cir.1989), *vacated,* —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584, *adhered to upon further consideration,* 893 F.2d 1433, *cert. denied,* —— U.S. ——, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989).

In its *en banc* ruling, the Court of Appeals "suggest[ed] that the district court allow plaintiffs an additional opportunity to file a new pleading," *id.,* 865 F.2d at 1392, in view of the appellate court's expressed doubt that the amended complaint met the requirements of Rule 9(b) and Rule 8(a) of the Federal Rules of Civil Procedure. The mandate from the Court of Appeals followed the Supreme Court's consideration of the RICO issue (resulting in an order of vacatur), and the Second Circuit's determination, nevertheless, to adhere to its prior *en banc* decision.

Following the Court of Appeals' decision, counsel for plaintiffs did not seek leave to amend the *Beauford* complaint, but in February 1990 filed, as a related matter, an additional, separate complaint alleging several of the same causes against several of the same defendants but in the name of a new plaintiff, Grossman, a condominium owner in Parkchester who resided in the apartment complex prior to its conversion. By the accompanying order to show cause, Grossman also sought a preliminary injunction, *inter alia,* directing Parkchester Apartments Co., the sponsor of the conversion ("Sponsor"), to pay a sum in excess of a million dollars to the Condominium and use its votes on the Board of the Condominium (the "Board") to revoke a recent increase in maintenance charges imposed on Condominium owners of approximately 35%. It was alleged that the present increases would not have been necessary if two years prior, defendants had not caused the Board to vote to abate the monthly maintenance charges for a period of one and a half months in February and March of 1988.

At the hearing on the order to show cause on February 15, 1990, counsel for plaintiff agreed to serve an amended complaint consolidating the *Grossman* action with the *Beauford* action. Counsel for defendants opposed the motion for preliminary relief and sought by cross-motion dismissal of the actions in their entirety. Counsel for plaintiff disclaimed the need

for an evidentiary hearing on the request for preliminary injunctive relief.

The consolidated complaint was filed thereafter on February 23, 1990, briefs on the motions were received prior to the oral argument on March 16, and the matter was taken on submission following receipt from plaintiff's counsel of a further submission dated March 23, 1990.

*The Consolidated Complaint*

The consolidated complaint substitutes Grossman, a Parkchester·South unit-purchaser, for former plaintiff Mr. Palmento, now deceased, who was the only condominium purchaser (as opposed to non-purchasing tenant) named in the *Beauford* action as a plaintiff. The other four named plaintiffs, all of whom are tenants at the complex who did not elect to purchase their apartments at the time of the conversion, remain unchanged from the original action. As for defendants, these remain essentially the same as in the original *Beauford* action.[1]

As in *Beauford*, the new complaint alleges violations of RICO and federal securities laws, as well as the related state law common law claims of fraud, breach of fiduciary duty and contract. New federal causes of actions arising under the antitrust laws and the Interstate Land Sales Full Disclosure Act are added to the consolidated complaint, notwithstanding that these claims which were not pleaded in either the *Beauford* or *Grossman* actions and that the filing of the consolidated complaint was authorized for no purpose other than to harmonize and particularize the pleading in those two actions.

### I. The Motion for Preliminary Injunctive Relief

The request for preliminary relief, supported by the affidavit of counsel for plaintiff, who perforce is without personal knowledge of the facts averred, is predicated on the First Claim of the Consolidated Complaint, which alleges that an abatement of maintenance charges for a month and a half in 1988 (an action sought by the Sponsor and agreed to by the Board, upon which the Sponsor has a majority of representatives by virtue of its continuing to own more than fifty percent of the units) violated Section 515 of New York's Not–for–Profit Corporation Law, as well as Local Law No. 70 of the City of New York for 1982.

According to the complaint and counsel for Grossman, this Board-authorized six week moratorium on maintenance charges, which was made possible by a drop in the price of oil at the time, reduced maintenance funds by $2.4 million in 1988. In 1990, necessary roof repairs and other maintenance needs of the Parkchester have required the Board to raise maintenance fees by 35% for five months and perhaps further into the future, and the operating budget projects a loss for the year.

On that factual basis, plaintiffs seek an order preliminarily (a) directing the Sponsor (but not the other unit owners) to pay to the Condominium a sum representing its share of maintenance charges that were not assessed upon it and all other unit holders in February and March 1988; (b) directing the Sponsor to use its votes on the Condominium Board to revoke recent increases in maintenance charges to condominium owners of approximately 35% to finance needed maintenance work, and (c) enjoining the Sponsor from any further use of its majority control of Parkchester South Condominium.

In this circuit, a party seeking a preliminary injunction must establish irreparable injury if the requested relief is not granted, and also demonstrate either that (a) it is likely to succeed on the merits or (b) the balance of hardships tip decidedly in its favor and there is a sufficiently serious question going to merits so as to make its

---

1. The Sponsor of the conversion (and former owner) of the Condominium—Parkchester Apartments Co.—is not named as a defendant in the consolidated complaint. The partners that compose the Sponsor, which is itself a New York partnership, are. The two alleged partners are defendant Supervisory Management Corp., a corporation owned by Harry Helmsley, and defendant Joseph V. Licari. In addition, other Helmsley-related entities are named defendants, as are numerous passive investors in the partnership.

claim a fair ground for litigation. *E.g.,* *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989). Grossman has not satisfied this standard.

## A. *Irreparable injury*

■ "It is well established that 'irreparable injury means injury for which a monetary award cannot be adequate compensation.'" *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917–18 (2d Cir. 1986), *quoting Jackson Dairy, Inc. v. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The demand that Parkchester immediately pay its share of $2.4 million in maintenance charges that Grossman contends ought to have been assessed against unit holders in six weeks of 1988 is a monetizable claim, as are the economic effects of a 35% increase in current maintenance charges. Despite counsel's contention that the harm to condominium owners "goes beyond dollar payments," no case has been made that denial of the requested emergency relief will cause irreparable harm to Grossman.

Although Grossman alleges that there is an urgent need now for the funds that might have been assessed in March 1988, the urgency is not demonstrated by any factual showing. Instead, Grossman's counsel simply states that the present effect of going without such funds is to cause present maintenance charges against unit holders to be assessed at a level higher than they would otherwise be. Assuming it is true that funds Grossman, the Sponsor and other unit holders might have been required to contribute in March 1988 would, if collected then, have supplanted a portion of the charges being collected now, the claim, itself expressed by Grossman in monetary terms, self-evidently is compensable (if at all) in dollars.

The allegation that the increased charges are in turn threatening to cause plaintiffs to default on their purchased units might require an assessment of irreparable injury had counsel offered or presented any evidence that Grossman (who alone seeks preliminary relief)—or any other Parkchester unit purchaser—faces such a difficulty.

Equally devoid of factual support is counsel's assertion that the 35% increase in maintenance charges has disrupted sales of units and lowered unit sale prices—claims which in any event demonstrate "[m]ere economic injury" that ordinarily "is not sufficient to warrant granting of a preliminary injunction." *Patterson v. United Federation of Teachers,* 480 F.Supp. 550, 553 (S.D.N.Y.1979).

Grossman also argues that irreparable injury flows from the shortage of funds that allegedly has resulted from the 1988 six-week abatement (as distinguished from the above harms caused by present efforts of the Condominium to collect additional maintenance funds): "Lack of funds means lack of proper maintenance, with loss of quality of life within the condominium."

The preliminary relief requested—an order rescinding the 35% increase in maintenance charges—would, however, have the likely effect of exacerbating rather than mitigating the maintenance problems assertedly caused by lack of funds, since such order, relative to the status quo, would further reduce the funds available to finance necessary maintenance. Grossman apparently desires a source of financing for necessary maintenance other than the increased monthly assessment that has been implemented by his Board, but that preference—even if it should later concretize into a legal right—does not establish a need for emergency relief predicated on injuries that can be avoided without disturbance of the status quo.

Moreover, the alleged shortage of funds for maintenance, assuming it threatens irreparable harm, neither supports the peculiar form of disturbance of the status quo sought by Grossman nor its peculiar timing. Without commenting on the disparity, Grossman seeks an order that would force the Sponsor to pay its share of the abated maintenance charges (based on its ownership of approximately 65% of the units), without a parallel requirement that Grossman and other unit purchasers who owned at the time of the six week moratorium (and who received and retained, per unit, an identical financial benefit therefrom)

contribute their respective shares. Grossman similarly does not explain or establish why, two years after he and others were aware of the abatement, there suddenly is an urgent need to collect the abated funds in place of other maintenance charges.[2] For each of these reasons, Grossman fails to show irreparable injury warranting the emergency relief sought against Parkchester Management Corp.

### B. *Probability of Success on the Merits*

Grossman also fails to demonstrate a likelihood of success on the merits of his claim for a preliminary injunction. Only by strained textual reading of the local and state statutes does Grossman make those laws appear to relate to the maintenance charge question presented here. The state legislation in question is Section 515 of the Not–for–Profit Corporation Law. That provision states in pertinent part that "a corporation shall not pay dividends or distribute any part of its income or profit to its members, directors or officers." N.Y. Not–for–Profit Corp. Law § 515(c) (McKinney's 1970).

Grossman's claim is that the abatement of the collection of maintenance charges from unit holders for six weeks was, in truth, a payment of dividends to unit holders. That contention ignores the distinction drawn in the statute between "fees, dues and assessments," on the one hand, *see* NPCL § 507, and dividends and distributions, on the other. *See* NPCL § 515; *In re Fosdick's Trust*, 4 N.Y.2d 646, 653, 176 N.Y.S.2d 966, 971, 152 N.E.2d 228, 232 (1958) (defining term "dividend"). Section 507 of the Not–for–Profit Corporation Law permits corporations organized thereunder to levy fees, dues and assessment upon members, and nowhere provides, once such fees are set at a given level, that they may not subsequently be altered or eliminated, temporarily or permanently. That appears

to be what the Board did, for a limited period. This law therefore does not offer support for Grossman's characterization of the six week maintenance charge moratorium as an unlawful dividend.

The other measure relied upon is Local Law No. 70 of the City of New York (1982). That ordinance provides that "for the preservation and improvement of ... housing accommodations" of the condominium or cooperative form, persons sponsoring conversions of apartments to such forms must

> establish and transfer to the cooperative corporation or condominium board of managers a reserve fund to be used exclusively for making capital repairs, replacements and improvements necessary for the health and safety of the residents of such buildings. Such reserve fund shall be exclusive of any other funds required to be reserved under the plan ... except a fund for capital repairs, replacements and improvements substantially similar in purpose ... [and] also shall be exclusive of any working capital fund....

New York City Admin.Code ch. 51, § YYYY51–3.0(a). The ordinance specifies the minimum amount that must be placed in the reserve fund and imposes reporting requirements with respect to the fund. *Id.* at § YYYY51–3.0(b), § YYYY51–4.0.

Grossman does not contend that defendants failed to establish such a reserve fund—in fact he states that such a fund was created by the Sponsor in the amount of $4,668,156. He does allege, on information and belief, that the Sponsor has caused such fund to be dissipated for purposes other than capital repairs, replacements and improvements. Neither evidence of such dissipation, nor the basis for his belief in its occurrence, is provided, making it untenable on this record to conclude there is a reasonable likelihood that Grossman will establish the merits of this claim. The only uncontested fact presented is of the

---

**2.** Grossman did not seek emergency relief from the abatement at the time it was implemented in March 1988, approximately two years before this application, although presumably Grossman's formula (funds = maintenance = quality of life) was as valid then as it is now. No

explanation has been offered for this delay, nor any evidence suggestive that the "quality of life within the condominium" declined suddenly prior to the filing of this application, so as to warrant preliminary relief.

six week abatement, and although that presumably reduced monies available for maintaining the Condominium, the abatement was not itself an expenditure of the $4 million in funds that Local Law 70 required the Sponsor to deposit in the reserve fund. For these reasons, Grossman has failed to establish a likelihood of prevailing on the merits of his claims under these cited state and local laws.

## C. *Balance of Hardships*

Finally, Grossman has not demonstrated that the immediate harm that he is likely to sustain from paying maintenance charges in the amount instituted by the Board or from permitting the Sponsor freely to cast its apportioned votes on the Board outweighs the hardship that would result to the Sponsor were it required to vote to revoke such increases, pay additional maintenance fees in disproportion to other unit holders, and in all other respects refrain from employing its votes on the Board.

As noted, Grossman has adduced no evidence establishing any specific and immediate harm to his interests apart from the easily monetizable percentage increase in his monthly maintenance charge. Moreover, granting Grossman's request to force a reduction in the maintenance fees across-the-board would impose a hardship on the Condominium and himself, since, as Grossman concedes, the maintenance fees are essential to undertaking necessary repairs of the Condominium.

The additional relief requested—an order that the Sponsor refrain from exercising its votes on the Board "for any purpose"—would cause serious hardships to the Sponsor and to the governance of the Condominium. The By–Laws of the Condominium contain a quorum requirement that a majority of the directors of the Board be present to conduct business. Given Grossman's allegations of Sponsor majority control, an order enjoining the Sponsor from exercising its votes on the Board would prevent achievement of the quorum necessary to Board decisionmaking as to the operation of the Condominium, to the obvious detriment of the Sponsor and possible detriment of the building. Even were a receiver appointed by the court (something which Grossman does not address in his papers), which would permit business to continue as usual, the Sponsor would no longer have any say in the management of a building in which it is said to own 64% of the apartments. Grossman has not established that he will sustain any injury that outweighs the immediate hardship of disenfranchisement that the Sponsor assuredly would suffer were the requested relief ordered. *Cf. Amalgamated Consultants Ltd. v. DeSavary,* 1985 WL 3044 (S.D.N.Y. Oct. 22, 1985) (investor in condominium denied emergency appointment of receiver to replace sponsor's stewardship of building given lack of demonstrable hardship or injury).

## II. *The Motions to Dismiss*

Two cross-motions to dismiss are before the court. The first, brought on behalf of Harry Helmsley and numerous other defendants, seeks dismissal of the plaintiffs' claims, *seriatim,* principally for the alleged failure of each cause to state grounds upon which relief may be granted. The second motion, brought on behalf of three passive investors in the Sponsor, seeks simply the dismissal of these particular defendants from the action. In view of the disposition of the former motion, the latter motion is not addressed.

*Standards Governing Motions under 12(b)(6)*

A court should dismiss a complaint for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P., if it appears beyond doubt that the plaintiff can prove no set of facts supporting its claim that entitles it to relief. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* —— U.S. ——, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2231–32, 81 L.Ed.2d 59 (1984); *Dahlberg v. Becker,* 748 F.2d 85, 88 (2d Cir. 1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). A court must construe the complaint's allegations in the light most favorable to the plaintiff and accept those allegations as true. *See*

*Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Ass'n.,* 423 F.2d 188, 191 (2d Cir.1969), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970).

### 1. *The Antitrust Claim*

■ Grossman alleges that the Sponsor, in conspiracy with all of the other defendants, used its control of the condominium association and Parkchester Management Corp. to restrain trade, by compelling Parkchester South to effect all of its purchases through Deco Purchasing and Distributing Co., Inc. ("Deco"). Deco allegedly assesses a handling charge ranging from 5 to 20 percent of sales price on all of such purchases made by it on behalf of Parkchester South. The complaint does not allege that any of the defendants own or control Deco, or that the purchasing services Deco provides are available elsewhere on more favorable terms. It does assert that if the Management Corp. did not control the Board, Deco would not serve as exclusive purchaser.

Although the complaint does not so explicate, the allegations appear to be an effort to state a tying claim. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). This circuit has thus far declined to adopt the requirement, prevalent elsewhere, that the unlawfulness of such agreements hinge upon a showing that the tying seller has an economic interest in the tied market. *See Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.,* 880 F.2d 1514, 1517 (2d Cir.1989). *Cf. Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co.,* 758 F.2d 203, 207–08 (7th Cir.1985); *Keener v. Sizzler Family Steak Houses,* 597 F.2d 453, 456 (5th Cir.1979); *Venzie Corp. v. United States Mineral Prods. Co.,* 521 F.2d 1309, 1317–18 (3rd Cir.1975) (each imposing this "economic interest" test). Thus, the absence of any allegation that Management Corp. stands to reap any economic gain from Deco's engagement as purchasing agent for Parkchester South may not condemn Grossman's anti-trust claim to dismissal.

The lack of any allegation that Parkchester South's use of Deco as a purchasing agent was, at the time of Grossman's acquisition of a unit in the Parkchester South building, made a condition of his purchase does, however, warrant dismissal. The complaint in effect pleads no preexisting "tie" between the alleged tying product (residential condominium units) and the alleged tied product (purchasing agent services), since Grossman does not contend that provision of the services of a particular purchasing agent, such as Deco, was even a contemplated subject of the offering (no less a condition of sale) when he bought his units. This lack of conditionality distinguishes this case from other tying cases involving purchase of real estate interests brought in this district. *See 305 East 24th Owners Corp. v. Parman Co.,* 714 F.Supp. 1296, 1302, 1305 (S.D.N.Y.1989) (requirement that purchasers of interests in cooperative also purchase leases of building's garage space and commercial space was set forth in offering plan governing conversion of building and plaintiffs testified that owner refused to sell the building without the leases); *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.,* 880 F.2d 1514, 1515 (2d Cir.1989) (all tenants in low-cost building were required by existing rule of management to subscribe to building's meal plan) (citing *Gonzalez v. St. Margaret's,* 668 F.Supp. 187, 189 (S.D.N.Y.1987)); *Johnson v. Soundview Apts. Housing Dev. Fund Co.,* 588 F.Supp. 1381, 1382 (S.D.N.Y.1984) (same). *See generally* Hovenkamp, *Tying Arrangements in the Real Estate Market: Federal Antitrust Law and Local Land Development Policy,* 33 Hast.L.J. 325 (1981) ("[a] tying arrangement is an offer or agreement to sell or lease a certain product only on the condition that the buyer agree to take a different product as well.").

Plaintiff with reasons cites *Mission Hills Condominium Ass'n M–1 v. Corley,* 570 F.Supp. 453, 456, 460 (N.D.Ill.1983) as sup-

port for a different result. That decision, however, did not expressly consider the necessity of a conditional relationship between the purchases in the tied and tying markets, and itself relies upon a decision in which the plaintiffs *did* allege that they were required, "as a condition of purchase of their units, to 'ratify and approve' ... a long-term management contract ...," *Johnson v. Nationwide Industries, Inc.,* 450 F.Supp. 948, 950 (N.D.Ill.1978). *Mission Hills* is thus less than persuasive authority for the proposition that an illegal tying arrangement exists when purchase of the allegedly tied product is not made a condition, but is only one possible consequences, of the purchase of the tying product.

In addition to the insufficiently alleged "tie," the antitrust claim does not plead that the asserted arrangement with Deco has caused Grossman any damage. Although Grossman alleges that Deco imposes a 5 to 20% charge for its purchasing services, he does not allege in the complaint that Deco's charges are excessive or that its competitors provide services of like quality for a lesser price. In the principal case Grossman's counsel relies on, the plaintiffs managed to do at least that much. *See Mission Hills,* 570 F.Supp. at 456 ("they claim that but for the defendants' actions, the plaintiffs could purchase these services from various other independent and more competent concerns on more favorable terms.").

"[T]o prevail in a private antitrust action, a plaintiff must show ... the plaintiff was damaged as a result" of a violation of the antitrust laws. *Volvo N.A. Corp. v. Men's Int'l Pro. Tennis Council,* 687 F.Supp. 800, 806 (S.D.N.Y.1988) (citation omitted). It is necessary at the pleading stage, therefore, to allege at least some such damage. Grossman has not done so in his complaint and for that reason too, the antitrust claim must be dismissed.

### 2. *The Interstate Land Sales Full Disclosure Act Claim*

■ Grossman claims that the Sponsor violated the provisions of the Interstate Land Sales Full Disclosure Act ("ILSFDA" or the "Act"), 15 U.S.C. §§ 1701–1720 (1982), by omitting material facts concerning the condition of the condominium apartments in Parkchester South from the Sponsor-prepared property report and misrepresenting other facts in the report. The claims fails as a matter of law because ILSFDA exempts from its requirements sales of property upon which building development has been completed at the time of sale.

"Congress, in passing the statute, desired to protect purchasers from unscrupulous sales of undeveloped home sites, frequently involving out-of-state sales of land purportedly suitable for development but actually under water or useful only for grazing." *Winter v. Hollingsworth Properties, Inc.,* 777 F.2d 1444, 1447 (11th Cir. 1985). *See also McCown v. Heidler,* 527 F.2d 204 (10th Cir.1975) (act prohibits fraud in land development enterprises); Conf. Rep.No. 1785, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Ad. News 2873, 3053, 3066. The protections afforded by the Act, which are to be construed broadly in accord with the remedial purposes of the legislation, *Timmreck v. Munn,* 433 F.Supp. 396 (N.D.Ill.1977), apply to the sale or lease of any "lot" not otherwise exempted under section 1702 of the Act. *See* 15 U.S.C. §§ 1703(a)(1), 1702.

The absence of any definition of the term "lot" led to litigation over whether its ambit reached the condominium form of real estate ownership, as it clearly did cover land sold in the more conventional forms such as the subdivision plot. The administrative agency responsible for promulgating regulations under the Act and courts that have addressed the question agree that sales of realty in the condominium form are embraced by the term "lot":

> The ILSFDA was intended to curb abuses accompanying interstate land sales. The Act accomplishes that goal by including within it all sales of lots and then exempting a number of transaction, including sales of fully improved property. It is reasonable to conclude, as HUD did, that the term "lot" was used to refer

generally to interests in realty. The legislative history supports this construction, employing the terms "lot," "land," and "real estate" in discussing the Act. This construction is also reasonable in terms of the purpose of the statute. A fraudulent out-of-state sale of land is not rendered any less fraudulent if the condominium form of ownership is utilized.

*Winter v. Hollingsworth*, 777 F.2d at 1448 (footnote omitted) (reversing 587 F.Supp. 1289 (S.D.Fla.1984). *See also Schatz v. Jockey Club Phase III, Ltd.*, 604 F.Supp. 537, 540–41 (S.D.Fla.1985); *Nargiz v. Henlopen Developers*, 380 A.2d 1361, 1364 (Del.1977).

The HUD and judicial interpretation of the Act to include condominium ownership within the meaning of "lot" does not serve, however, to extend the coverage of the Act to sales of improved, developed realty, whether or not of condominium form. Section 1702(a)(2) expressly exempts sales of such improved land "on which there is a residential, commercial, condominium, or industrial building ..." (or land upon which the seller has contracted to complete construction of such a structure within a period of two years), 15 U.S.C. § 1702(a)(2), and plaintiff points to no case subjecting sales of *completed* condominiums to the Act's provisions.[3] *Schatz* (a Florida District court case decided before the Eleventh Circuit opinion in *Winter*) involved merely an application of the two-year, "to be built" exemption, which it found on the facts the sale's agreement did not satisfy. 604 F.Supp. at 542.

The case in no way supports Grossman's novel proposition that ILSFDA governs sales of fully-developed condominia, such as compose the Parkchester complex. Reliance on it (and no additional authority, legislative history, or legal reasoning) for that point is particularly incredible in view of the crystal-clear pronouncement by the Eleventh Circuit in *Winter*, issued a matter of months following the district court opinion in *Schatz*:

We decline to depart from the plain language of the statutory exemption. If at the time the purchaser signs the contract there exists a condominium building or the seller is obligated to erect such a building within two years, the sale is exempt from the Act. If, as in this case, no building exists at the time of contracting and the contract does not contain a binding obligation to complete one within two years, compliance with the statute is required.

*Winter*, 777 F.2d at 1450; *see also Markowitz v. NortheastLand Company*, 1989 U.S.Dist. Lexis 9433 (M.D.Pa.1989) (dismissing ILSFDA claim based upon section 1702(a)(2) exemption); *Nargiz v. Henlopen Developers*, 380 A.2d 1361 (Del.1977) (where developer and purchaser contract for sale of condominium which did not exist at time, sale does not satisfy statutory language exempting sale of improved property on which there is a residential building).

For the reasons indicated, Grossman's theory is inconsistent with the legislative history of ILSFDA, its construction by HUD, and the meaning assigned to the section 1702(a)(2) exemption by courts that have found it necessary to consider the matter. Accordingly, the ILSFDA claim is dismissed.

### 3. *The Securities Claim*

■ The court's prior opinion in this action addressed and denied the contention that Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), was violated when Parkchester was converted to condominium ownership, on grounds that the condominium sales are not within the scope of the federal securi-

---

3. HUD explained the treatment of condominiums as follows: "For a condominium unit sale to be exempted from the Act, ... either it must be completed before it is sold, or it must be sold under a contract obligating the seller to erect the unit within two years from the date the purchaser signs the contract of sale." 38 Fed. Reg. 23,866 (1973). *See also* 44 Fed.Reg. 24,012 (1979); *Winter v. Hollingsworth*, 777 F.2d 1444, 1448–49 (11th Cir.1985) (Congress acted to exempt condominium sales "where the building is existing or must, by contract, be completed within two years.").

ties laws.[4]  That holding, which relied upon *Bender v. Continental Towers Ltd., Partnership*, 632 F.Supp. 497 (S.D.N.Y.1986), was not disturbed on appeal, and accordingly, is not subject to reexamination here.

Nevertheless, without seeking leave of court, counsel for plaintiffs has asserted an "investment contract" claim under Section 10(b) in the consolidated complaint.[5]  Counsel's conduct in the *Bender* action, in which parties represented by the same lawyer likewise pursued a securities cause of action based on condominium sales, resulted in sanctions against him in the amount of $1,000 when, among other things, a claim was improperly realleged in an amended complaint.  *See Bender v. Continental Towers Ltd.*, 1987 WL 16146 (Aug. 21, 1987).  Without addressing the appropriateness of sanctions for counsel's conduct in the instant action, the securities claim herein is dismissed on the grounds previously stated, grounds which counsel failed to challenge on appeal.

The same conclusion applies to the extent the "new" claim is founded upon Section 17(a) of the Securities Act of 1933.  No private right of action has been held to exist under that provision.  *See, e.g., McCowan v. Dean Witter Reynolds, Inc.*, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94, 423 at 92,724, 1989 WL 38354 (S.D.N.Y. Apr. 11, 1989); *The Limited Inc. v. McCrory Corp.*, 683 F.Supp. 387 (S.D.N.Y.1988); *Ackerman v. Clinical Data, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 92,207 at 91,566, 1985 WL 1884 (S.D.N.Y. July 8, 1985).  Accordingly, the securities cause of action is dismissed in its entirety.

### 4.  *The RICO Claim*

Plaintiffs allege that the defendants, as a group, violated RICO by using the mails to send to tenants and other prospective purchasers Offering Plans containing deliberate misinformation concerning the conversion of Parkchester South.  The Court of Appeals for the Second Circuit and the Supreme Court previously have considered the adequacy of the claim with respect to the RICO requirements that the alleged mail fraud acts constitute a "pattern" of "racketeering activity" revealing continuity.  *See Beauford v. Helmsley*, 865 F.2d at 1392.  Those elements are not placed again in question here.

### i.  Material Misrepresentations

Under Rule 12(b)(6), Fed.R.Civ.P., defendants seek dismissal principally on the ground that Grossman's allegations of fraudulent representations in the Offering Plan are refuted by the Plan itself.  *See Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 170 n. 3 (S.D.N.Y.1988) (permitting consideration, on motion to dismiss, of contents of private placement memorandum which, although not attached to complaint, was mentioned therein as source of alleged misrepresentations); *see also Decker v. Massey–Ferguson Ltd.*, 681 F.2d 111, 113–18 (2d Cir.1982) (affirming dismissal of several alleged misrepresentations in company's annual report where document did not support allegations of complaint); *Crystal v. Foy*, 562 F.Supp. 422 (S.D.N.Y.1983) (Weinfeld, J.) (dismissing complaint upon examining sources cited by plaintiff as containing misrepresentations and finding that "[p]laintiff's own source repels her claim ..."); *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 227–228 (S.D.N.Y.1989) (same).

---

**4.**  Footnote One of the Opinion, in addressing the securities claim, stated:

The sale of condominium units, even when "made in contemplation of appreciation solely through the efforts of defendants," as the complaint alleges, does not constitute a sale of securities.  *See Bender [v. Continental Towers, Ltd., Partnership]*, supra, 632 F.Supp. 497.  Even though the sponsor of an offering plan might influence the value of the units through its marketing efforts and its own buying and selling strategies, a "piece of real estate, such

as a condominium, has an inherent worth not solely dependent on the efforts of the promoter."  *Bender, supra*, 632 F.Supp. at 501.

*Beauford*, 650 F.Supp. at 550 n. 1.  *See also Grenader v. Spitz*, 537 F.2d 612, 617 (2d Cir.), *cert. denied*, 429 U.S. 1009, 97 S.Ct. 541, 50 L.Ed.2d 619 (1976).

**5.**  The complaint fails to specify on behalf of which of the plaintiffs this securities claim is brought.

Although it is a close question, defendants have failed to establish that Grossman can prove no set of facts that might establish that material information was withheld from him and other purchasers of condominium units. To be sure, a facial examination of the offering plan indicates that it provided notice to prospective buyers that, among other things, (a) the plumbing system was aging and required repairs, (b) certain portions of the roofs had leaks and required repairs, and (c) the electrical wiring, although adequate for existing conditions, would not sustain installation of additional loads.

The complaint alleges, however, that the disclosures in the Offering Plan were less than complete, and the substance of the allegedly omitted information cannot be said to be immaterial to a decision whether and at what price to purchase a Parkchester South unit. According to plaintiffs, Sponsor had received reports "from its own engineers that the plumbing system was so deteriorated that it had to be completely replaced," and knew or should have known that the roofs and wiring also were so deteriorated or inadequate that they required replacement. Nevertheless, they contend the Sponsor deliberately withheld that information from the Offering Plan in order to "deceive and defraud the buyers of condominium apartments by concealing serious problems in the physical plant of Parkchester South."

It may turn out, as defendants contend, that there exists merely a difference of opinion between the Sponsor, Grossman and certain tenants as to the proper scope of repairs and maintenance that Parkchester South requires, and therefore, nothing approaching fraudulent conduct on any defendant's part. *Cf. Bender v. Continental Towers Limited Partnership*, 1987 W.L. 10196 (S.D.N.Y.1987). However, given the apparent materiality of at least some of the information that the complaint alleges was not disclosed (such as the supposed necessity of wholesale replacement of the plumbing system at considerable expense), the allegation that such information was deliberately suppressed, and the requirement at this juncture that such allegations be as-

sumed true, defendants' contention that this is nothing more than a disagreement as to the appropriate means of maintaining a building cannot sustain an order of dismissal of this cause of action, at least to the extent the claim is maintained by Grossman alone.

### ii. Lack of Injury to Non–Purchasing Plaintiffs

■ More persuasive is defendants' plea for dismissal of the non-purchasing tenants from the RICO claim on ground that this claim alleges no injury to non-owning non-purchasers. That is true. Although the claim is nominally brought on behalf of both Grossman (the purchasing/owner plaintiff) and the other, non-purchasing, plaintiffs, the paragraphs of the RICO claim that describe, and ascribe causality and injury to, the fraudulent schemes that forms its basis speak only of these schemes' effects upon "buyers and owners." *See* ¶ 93 ("The fraud consists, in part, of deliberate misinformation to buyers, and to owners of condominium apartments, for the purpose of defrauding said buyers and owners"); ¶ 94 ("... there is no foreseeable end to the scheme to defraud the condominium owners by the defendants"); ¶ 98 (referring generally to "the several schemes to defraud owners and buyers of condominiums"); ¶ 99 ("The schemes to defraud have resulted in damages to the owners of condominiums in the hundreds of millions of dollars.").

The complaint's failure to plead any injury to non-purchasing plaintiffs under the civil RICO claim requires dismissal of the claim as to these plaintiffs, since economic injury is a necessary element of liability under such a claim. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (plaintiff "can only recover to the extent that [ ] he has been injured in his business or property by the conduct constituting the violation."); *Burdick v. American Express Co.*, 865 F.2d 527, 529 (2d Cir.1989) (plaintiff must allege non-remote economic injury arising from predicate acts); *O'Malley v. O'Neill*, 887 F.2d 1557, 1561 (11th Cir.1989) (same).

iii. Particularity of Pleading under Rule 9(b)

■ Moreover, defendants correctly point out that the RICO claim fails to particularize the roles of the individual defendants in perpetrating the allegedly fraudulent acts, as is required by Rule 9(b), Fed. R.Civ.P. "[W]hen a plaintiff sues sixteen defendants, he or she has an obligation to allege specifically the fraud perpetrated by each defendant." *Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1982); *accord Di Vittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) ("where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."). In civil RICO actions, "the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency...." *Plount v. American Home Assur. Co.,* 668 F.Supp. 204, 206 (S.D.N.Y.1987); *Rich–Taubman Associates v. Stamford Restaurant Operating Co.,* 587 F.Supp. 875, 878 (S.D.N.Y. 1984).

This RICO claim is brought against all of the defendants to this action but does not specify with particularity what any one of those numerous defendants did. The allegations in the complaint asserting fraudulent conduct repeatedly refer to the Sponsor as actor, yet plaintiffs do not sue the Sponsor. No specific action is attributed to any one of the thirty-five named defendants; indeed, none appears to merit mention in the paragraphs of the complaint composing the RICO cause, other than collectively, as "defendants." This sort of general pleading does not give each defendant "fair notice" of what he or she did to further the fraudulent scheme, as Rule 9(b) requires. *Di Vittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *see also Bingham v. Zolt,* 683 F.Supp. 965, 973 (S.D.N.Y.1988); *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1197 (S.D.N.Y. 1981).

Pursuant to Rule 9(b), therefore, the plaintiffs' RICO claim must be dismissed. In view of the procedural history of this action, and, in particular, plaintiffs' failure to attend to the prior cautionary instruction delivered by the Second Circuit to them with respect to this issue, *see Beauford v. Helmsley,* 865 F.2d at 1393 ("we doubt that the complaint [meets] the requirements of Fed.R.Civ.P. 9(b), which requires that fraud be pleaded with particularity"), leave is not given plaintiffs, once again, to replead with particularity the roles played by each of the individual defendants named in the complaint in the fraudulent schemes alleged therein. Should plaintiffs' counsel form a reasonable belief, after reviewing the relevant authorities and investigating the facts, that a RICO claim complying fully with Rule 9(b) can be executed, such a proposed amended complaint may be submitted on motion, supported by memorandum of law, within thirty days of this opinion.

5. *The State Law Claims*

In view of the absence of a valid remaining federal claim, further jurisdiction over the pendent state claims asserted by the plaintiffs is presently declined. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Albany Ins. Co. v. Esses,* 831 F.2d 41, 45 (2d Cir.1987).

*Conclusion*

For the reasons set forth above, the motion for a preliminary injunction is denied. Pursuant to Rule 12(b)(6), the claims in the complaint arising under the federal antitrust laws, Interstate Land Sales Full Disclosure Act and federal securities laws are dismissed with prejudice. Grossman's RICO claim and the pendent state law claims set forth in the complaint are also dismissed, pursuant to Rule 9(b) and *Gibbs,* subject to reconsideration of dismissal upon the submission to the court, within thirty (30) days from the date of this opinion and order, of a motion seeking leave to file a proposed amended complaint containing a well-pleaded RICO claim.

It is so ordered.